**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**Civil Action No. 3:26-cv-912**

| | | |
|---|---|---|
| ALISHA D. MAZZA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ASHEVILLE;<br>CHRISTOPHER B. BUDZINSKI, in his individual capacity; and<br>REBECCA OGLES, in her individual capacity,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **COMPLAINT**<br>**(Jury Trial Demanded)** |

Plaintiff Alisha D. Mazza ("Plaintiff" or "Ms. Mazza"), complaining of Defendants City of Asheville (the "City"), Christopher B. Budzinski ("Budzinski"), and Rebecca Ogles ("Ogles"), alleges as follows:

## Nature of the Action

**1.** This is an employment discrimination and retaliation action against the City of Asheville and two City officials. The City posted two management jobs in 2025 and, both times, passed over Alisha Mazza for reasons its postings did not support. Ms. Mazza is a Black woman with a Master's degree who has worked for the City for fourteen years. For the Senior Recovery Business Manager position, the City chose a white candidate for her "construction experience," a qualification the posting never listed and the interview never asked about. For the Fire Administration and Financial Business Manager

position, a job built around supervising staff and managing budgeting, purchasing, grants, and contracts, the City called Ms. Mazza "one of our top contenders." Then it gave the job to a white woman with about three years at the City, mostly in communications, a supporting duty rather than a minimum qualification, whom its own Budget Manager said: "doesn't know anything about the budget process."

**2.** The law requires promotion decisions made without regard to race. More than a year before either decision, the City's own consultants told its City Council and City Manager that its subjective hiring had "systematically prejudiced" Black women.

**3.** The City left those practices in place, and Ms. Mazza paid the price twice.

**4.** Ms. Mazza brings employment discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983.

## Parties, Jurisdiction, and Venue

**5.** Plaintiff Alisha D. Mazza is a Black woman and a resident of Buncombe County, North Carolina.

**6.** Defendant City of Asheville is a North Carolina municipal corporation with its principal offices at 70 Court Plaza, Asheville, North Carolina 28801.

**7.** The City has employed more than 500 employees for each working day in twenty or more calendar weeks in the current or preceding calendar year, and it is an employer within the meaning of 42 U.S.C. § 2000e(b).

**8.** The City has employed Ms. Mazza at all relevant times.

**9.** Defendant Christopher B. Budzinski is, on information and belief, a resident of Transylvania County, North Carolina.

**10.** At all relevant times, Budzinski was Deputy Fire Chief of the Asheville Fire Department and the hiring manager for the Fire Administration and Financial Business Manager position.

**11.** Budzinski is sued in his individual capacity.

**12.** Defendant Rebecca Ogles is, on information and belief, a resident of Buncombe County, North Carolina.

**13.** At all relevant times, Ogles was the City's Assistant Finance Director and the hiring manager for the Senior Recovery Business Manager position.

**14.** Ogles is sued in her individual capacity.

**15.** This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., including 42 U.S.C. §§ 2000e-2(a), 2000e-2(m), and 2000e-3(a), and under 42 U.S.C. § 1981, as enforced against state actors through 42 U.S.C. § 1983.

**16.** Jurisdiction over Plaintiff's Title VII claims is conferred on this Court by 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

**17.** Jurisdiction over Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 is conferred on this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

**18.** Plaintiff has satisfied every administrative prerequisite to her Title VII claims (¶¶ 20–26).

**19.** Venue is proper in this District and Division under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), because the City is located here and the employment practices at issue occurred here.

**Administrative Proceedings**

**20.** On March 26, 2026, Ms. Mazza filed EEOC Charge No. 430-2026-02530 against the City.

**21.** The charge alleged discrimination based on race, color, and sex, and retaliation, in violation of Title VII.

**22.** The charge challenged Ms. Mazza's non-selection for the Fire Administration and Financial Business Manager position, for which the City notified her on October 10, 2025.

**23.** The charge also described Ms. Mazza's non-selection for the Senior Recovery Business Manager position and the City's reposting of that position.

**24.** The charge alleged retaliation based on Ms. Mazza's complaints, with other Black female employees, during the City's 2024 Cease the Harm audit. Ms. Mazza was one of seventeen black women who complained about racial disparities within the City's hiring and promotion practices.

**25.** On July 30, 2026, the EEOC issued Ms. Mazza a Determination and Notice of Rights, which she received by email that day.

**26.** Ms. Mazza filed this action within ninety days of receiving the Notice of Rights.

**27.** Ms. Mazza's retaliation claims include conduct after her charge that is reasonably related to the charge and arises out of it.

**28.** Ms. Mazza's claims under 42 U.S.C. § 1981, enforced through § 1983, require no administrative exhaustion and are timely.

**29.** Acts outside the Title VII charge-filing period are alleged as background evidence of intent and as independent violations of § 1981.

## Factual Allegations

### A. Ms. Mazza's Employment and Qualifications

**30.** The City hired Ms. Mazza on or about August 27, 2012.

**31.** She became Permit Facilitator in 2015, Special Projects Coordinator in 2019, and Business Services Supervisor in the Finance Department in 2021.

**32.** Ms. Mazza is an exempt employee.

**33.** Ms. Mazza has been classified at pay grade EX-10 for five years, including when she applied for each position at issue.

**34.** Ms. Mazza holds a Master's Degree in Business with a concentration in Public Administration.

**35.** As Business Services Supervisor, Ms. Mazza has supervised business services staff.

**36.** Ms. Mazza's duties include contracting, requisitions, invoice review and approval, budget management, and procurement compliance.

37. Ms. Mazza works daily in Munis, the City's financial software, to perform budgeting, purchasing, and contract functions.

38. Ms. Mazza served as staff liaison to the City's Policy, Finance, and Human Resources Committee. She currently serves as staff liaison to the Audit Committee.

39. Ms. Mazza has never been disciplined for failing to perform her duties.

40. Ms. Mazza's supervisor wrote in a recent annual evaluation that her "years of experience and cross-departmental knowledge are definitely an asset for the department and the City as a whole." It was Ms. Mazza's first evaluation in the last nine years.

## B. The Fire Administration and Financial Business Manager Position

**The posting.**

41. On September 2, 2025, the City posted the Fire Administration and Financial Business Manager position in the Asheville Fire Department, Job No. 2025-01699, with a closing date of September 17, 2025.

42. The posting stated that the position "is responsible for supervising and overseeing the business services support staff, the Communications Specialist, and managing financial activities, including budgeting, purchasing, and grants for the Fire Department."

43. The first essential duty the posting listed was to "[s]upervise[], direct[], and evaluate[] assigned staff."

**44.** The posting described the position's duties as financial and administrative, including to "[m]anage[] financial activities and administrative support staff for the fire department."

**45.** The posting listed contract administration among the position's functions.

**46.** The posting described the position's communications role as to "[a]ssist[] in the management of departmental communications strategies," including "providing insight and direction to the department's communications specialist."

**47.** The posting's minimum qualifications required a "Bachelor's Degree in Business Administration, Public Administration, Accounting, or a related field . . . supplemented by five years of progressive leadership experience in public administration, contract management, project and budget management, or any equivalent combination of education, training, and experience."

**48.** The minimum qualifications did not require communications or public information experience.

**49.** A supplemental application question asked each applicant, "How many years of experience do you have in management or supervision?"

**50.** Ms. Mazza met or exceeded every minimum qualification.

**The selection process.**

**51.** Budzinski was the hiring manager.

**52.** The Fire Department assembled the interview panel.

**53.** The City's Human Resources Department sought applications from candidates, but it did not select the interview panel. The hiring manager selected the interview panel and the questions for the interviewee.

**54.** During the period when the position was filled, the City had not yet centralized hiring through its Human Resources Department, and the hiring process had not been standardized across City departments. Therefore, departments varied in how they conducted hiring. To date, Human Resources has not assembled interview panels within the Organization nor facilitated panels within various departments.

**55.** No Black women worked in the Asheville Fire Department when the position was filled.

**The selection.**

**56.** Ms. Mazza applied for the position on or about September 5, 2025.

**57.** Ms. Mazza was interviewed on or about September 19, 2025, and was chosen as one of three finalists from approximately twenty applicants.

**58.** On October 2, 2025, Ms. Mazza emailed Budzinski to ask whether a decision had been made.

**59.** On October 9, 2025, the selected candidate told Ms. Mazza and a coworker that she was moving to the Fire Department to fill the position. The selected candidate expressed shock at being chosen for the position and indicated that the job duties would entail a steep learning curve. At the meeting announcing

the selection, the City's Budget Manager remarked that the selected candidate "doesn't know anything about the budget process."

**60.** On October 10, 2025, Budzinski emailed Ms. Mazza that the City had "moved forward with another candidate."

**61.** In the same email, Budzinski called the decision "incredibly tough," called Ms. Mazza "one of our top contenders," and wrote that "[w]e were all very impressed with your background."

**62.** The selected candidate is a white woman.

**63.** The selected candidate had worked for the City for about three years, primarily as a communications specialist.

**64.** The selected candidate had no supervisory experience in administration or financial management in local government.

**65.** The selected candidate had no experience in local government finance, budgeting, purchasing, or contract administration.

**66.** The selected candidate did not have five years of progressive leadership experience in public administration, contract management, or budget management.

**The explanations.**

**67.** On November 10, 2025, Ms. Mazza asked Budzinski in writing why she was not selected.

**68.** On November 13, 2025, Budzinski offered to talk but gave no written explanation.

**69.** On November 14, 2025, Ms. Mazza replied that a written response was fine. Budzinski failed to provide one.

**70.** On or about November 19, 2025, Budzinski told Ms. Mazza that she had "the financial side of the coin covered 100%" and was "a great leader in finance," but that the deciding factor was "communication strategies," which "set the other candidate aside."

**71.** In his October 10, 2025, email, Budzinski called the position the "Fire Administration and Business Services Manager role."

**72.** The prior Fire Administration and Business Services Manager was white and hired into it from the Business Services Supervisor position that Ms. Mazza now holds. The City placed that employee in the Fire Administration and Business Services Manager role without an interview.

## C. The Senior Recovery Business Manager Position

**73.** After Hurricane Helene, the City created the Senior Recovery Business Manager position in the Finance Department to manage recovery funding.

**74.** The City planned to fill two positions with that title.

**75.** On May 16, 2025, the City posted the Senior Recovery Business Manager position, Job No. 2025-01604, open *only* to current City employees, with a salary of $66,293.38 to $69,608.05 and a closing date of May 29, 2025. Ms.

Mazza would have received at a minimum, a 10% pay increase for moving up 2 pay grades if she received the Senior Recovery Business Manager position.

**76.** The posting described the position as providing "direct specialized administrative support for disaster recovery initiatives, with a strong focus on FEMA Public Assistance (PA) compliance, project coordination, and interdepartmental communication."

**77.** The posting's duties included "[o]ffer[ing] oversight to department finance and business managers involved in recovery-funded projects" and supporting "documentation of compliance with City-defined recovery processes, including project approvals, procurement, financial management, and reporting."

**78.** The posting's minimum requirements were "[t]wo years of experience in administrative support, project coordination, or financial compliance plus a Bachelor's Degree in Accounting, Business, or a related field."

**79.** The posting did not list construction experience as a qualification.

**80.** At the time of the posting, Ms. Mazza routinely performed procurement, financial-management, compliance, and documentation duties as Business Services Supervisor.

**81.** Ms. Mazza applied for the position on or about May 19, 2025.

**82.** Ms. Mazza exceeded the posted minimum requirements and was interviewed.

**83.** The City and Ogles selected a white candidate and prepared an offer for her.

**84.** Ogles told Ms. Mazza that the selected candidate had "construction experience." During Ms. Mazza's tenure in finance, Ogles had never promoted a black employee but had promoted white employees.

**85.** When Ms. Mazza asked, Ogles admitted that no questions were asked during the interview about the candidates' construction experience.

**86.** The white candidate later declined the position because she had been offered employment elsewhere.

**87.** The City then told Ms. Mazza that she would have to apply again.

**88.** The City's recruitment and selection policy provided that a requisition filled or cancelled within the prior ninety days "may be reopened for additional or resumed candidate consideration without an additional posting period."

**89.** The City did not reopen the requisition. On or about August 4, 2025, it created a new requisition and reposted the position.

**90.** The City's policy permitted the original requisition to be reopened, for which Ms. Mazza was an available candidate.

**91.** As of the date of this filing, the City has not filled the reposted position.

**92.** The position remains on the Finance Department's organizational chart.

**D. The City's Custom of Subjective Promotion Practices and Its Policymakers' Notice**

**93.** Under N.C. Gen. Stat. § 160A-148, the City Manager has authority to appoint, promote, and remove City employees.

**94.** Under N.C. Gen. Stat. § 160A-164, the City Council adopts the City's personnel policies.

**95.** The City Manager is the City's final policymaker for hiring and promotion.

**i. Notice to the City's policymakers.**

**96.** For several years, starting before 2024 and continuing to the present, a group of Black female City employees, including Ms. Mazza, complained to the City Manager, the City Attorney, and members of City Council that Black women were being denied advancement.

**97.** With the City Manager's approval, the City Attorney investigated those complaints and reported to the City Manager.

**98.** The City Attorney found weak HR procedures, unclear promotion policies and procedures, undisclosed hiring criteria, and inconsistent practices.

**99.** On June 19, 2018, the City Council adopted an Equity Action Plan whose first workforce objective was to "eliminate racial disparities in hiring and promotions." The Plan called for every hiring manager to complete implicit-bias training by June 2019 and for the City to collect employment data broken down by race, salary range, and position. At the time, the City's executive and senior-level employees were 90 percent white.

**100.** In a March 9, 2021, Equity and Inclusion Assessment, the City's Internal Auditor reported that mandatory training for hiring managers and selection-process assessors was still "being developed," and that the Plan's

annual equity accountability agreements between the City Manager and the Management Team had not been created: "Neither has happened."

**101.** The Internal Auditor also reported that the City "does not have a history of tracking" recruitment and retention outcomes, and recommended baseline implicit-bias training for every employee who supervises others.

**102.** In fiscal year 2020, Black employees made up 10.11 percent of the City's workforce but received 5.80 percent of temporary assignments to higher-graded positions; white employees received 94.20 percent.

**103.** Three years after that Assessment, the Cease the Harm audit found that the City still did not require training for hiring managers or interview panel members.

**104.** In 2024, Carter Development Group conducted the City's "Cease the Harm" audit. On March 26, 2024, Carter Development Group presented the audit's findings to the City Council at a regular meeting attended by City Manager Debra Campbell and City Attorney Brad Branham. The presentation identified the lack of wide-scale racial equity training among City staff as a key harm and recommended that the City revise its interview-panel policy and procedure by moving to a search-and-screen committee approach, beginning with supervisory positions.

**105.** The audit reported that approximately seventeen Black female employees, which included Ms. Mazza, had complained that the City engaged in a pattern and practice of denying internal promotions to Black females.

**106.** The audit concluded that Black female employees had been "systematically prejudiced in the City's hiring and salary allocation due to a lack of or unclear policies that guide the recruitment and hiring process."

**107.** The audit found that "[t]he subjectivity and inconsistency in practice have created a covert and evasive bias toward Black female employees."

**108.** The audit found that the City did not require training for hiring managers or interview panel members.

**109.** The audit found that the City had no standard guidelines for panel interviews, "leading department leaders to establish subjective requirements and processes."

**110.** The audit found that the City's recruitment and selection policy for internal postings was vague.

**111.** The audit assigned the City's recruitment and selection process a harm score reflecting "the significant effects consistent with disproportionality and exclusion impacting the advancement of Black female employees."

**112.** The audit found that the City did not collect workforce metrics tracking equity and inclusion. The audit also reported that "[a]pproximately 1% (14) of Black/African American employees are in management roles" and that "[n]onwhite employees make up approximately 2.4% of all managers."

**113.** The audit recommended search-and-screen committees, written hiring procedures, tracking of promotions and compensation by race, mandatory

training for managers, and a women's leadership program with a clear path for advancement.

**114.** On February 9, 2024, Raftelis also delivered a Human Resources Organizational Assessment to City Manager Debra Campbell.

**115.** Raftelis reported that the City's recruitment process "is administered inconsistently across departments, position types, and hiring managers," which "creates a risk for inequitable practices and outcomes." Raftelis also reported stakeholder "concerns about equitable and fair hiring and compensation decisions in the absence of formally documented practices."

**116.** Raftelis reported that many hiring managers were "taking over portions of the recruitment process that should be centrally administered." Raftelis further reported that the Human Resources Department "has been unable to develop consensus on or document what the desired process for employee recruitment should be."

**ii. Failure to remedy the problem before the denial of promotion.**

**117.** On information and belief, when the City filled the Fire Administration and Financial Business Manager position in October 2025, it had not adopted search-and-screen committees for supervisory positions.

**118.** On information and belief, the City did not require Budzinski, Ogles, or the panel to complete bias or equitable-hiring training before that selection.

**119.** On information and belief, the City did not use a standardized scoring rubric for that selection.

**iii. The results.**

**120.** As of the filing of this Complaint, only nine Black women hold exempt positions in the City's workforce.

**121.** On information and belief, none of them is classified above pay grade EX-13, although the City's exempt pay grades run to EX-21.

**122.** The Fire Administration and Financial Business Manager position was classified above pay grade EX-11 when Ms. Mazza applied.

**123.** On information and belief, the City's exempt white employees have earned approximately fifteen percent more on average than their exempt Black female peers.

**124.** The City's Equal Employment Opportunity Policy stated that the City would "take proactive measures . . . to recruit minorities and females to all levels of the organization, especially in areas where these groups are currently underutilized."

**125.** On information and belief, the City removed that language shortly after Ms. Mazza complained to the Assistant City Manager on or about December 12, 2025.

**126.** After receiving the findings described above, the City's policymakers allowed department-controlled, subjective selection to continue.

**E. Ms. Mazza's Protected Activity and the City's Retaliatory Animus**

**127.** Ms. Mazza complained, with other Black female employees, to the City Manager, the City Attorney, and members of City Council that Black women were being denied advancement.

**128.** Ms. Mazza participated as a complaining employee in the 2024 Cease the Harm audit. Ms. Mazza later complained to the City Attorney after the 2024 Cease the Harm audit through 2025.

**129.** On October 21, 2025, Ms. Mazza complained to the former City Manager and the Human Resources Director about the absence of Black women in the Fire Department.

**130.** On or about December 12, 2025, Ms. Mazza complained to the Assistant City Manager about race discrimination.

**131.** On March 26, 2026, Ms. Mazza filed her EEOC charge.

**132.** The City Attorney interviewed Ms. Mazza about her complaints.

**133.** The City Manager, the Human Resources Director, and members of City Council received her complaints.

**134.** The former City Manager knew of Ms. Mazza's complaints.

**135.** Both the former City Manager and the current City Manager knew of the Cease the Harm audit and its findings.

**136.** The City's Human Resources Department, which participated in the Cease the Harm audit review of complaints from Black female employees, did not transition from an interview panel process to a search and screen committee for the October 2025 Fire Department selection.

**137.** Since her protected activity, the City has not promoted Ms. Mazza to any upper-level exempt position.

**138.** On May 31, 2026, the business services specialist whom Ms. Mazza supervised retired.

**139.** After that retirement, and after Ms. Mazza's complaints and charge, the Finance Director and the Assistant Finance Director eliminated the specialist position.

**140.** The City assigned the specialist position's duties to Ms. Mazza without additional pay.

**141.** Ms. Mazza now performs the lower-level duties of the position she once supervised.

**142.** Elimination of the position took away Ms. Mazza's only direct report. She no longer supervises any employee.

**143.** Ms. Mazza can no longer state on a résumé or application that she has direct reports.

**144.** The posting for the Fire Administration and Financial Business Manager position required each applicant to state years of supervisory experience (¶ 49).

**145.** On information and belief, the City's other management positions also weigh supervisory experience.

**146.** Without a direct report, Ms. Mazza cannot increase her supervisory experience to improve her qualifications for supervisory positions. Thus, her opportunities for advancement have been reduced.

**147.** These changes left Ms. Mazza worse off with respect to identifiable terms and conditions of her employment, including her responsibilities, her supervisory role, her workload, and her opportunities for advancement.

**148.** Ms. Mazza has been harmed by these changes even though her title and pay remained the same.

**Ms. Mazza's working conditions.**

**149.** When Ms. Mazza complained in person to the former City Manager and the Human Resources Director after being denied those two promotions, the former City Manager laughed.

**150.** At that meeting, the Human Resources Director responded that "[t]here are other forms of diversity," although no Black employees then worked in the Human Resources Department.

**151.** At that meeting, the Human Resources Director also said she did not know why Ms. Mazza was "just hyper-focused on Black women."

**152.** The City took no corrective action in response to Ms. Mazza's complaints.

**153.** The City also assigned Ms. Mazza the vendor registry, a duty of the Purchasing Manager, whose position is three pay grades above hers, without additional pay. The Purchasing Manager is white.

**154.** Ms. Mazza now performs the work of her own position, the eliminated specialist position, and part of the Purchasing Manager position, while being paid only for her own.

**155.** The duties the City added to Ms. Mazza's workload were not part of her position.

**156.** The removal of Ms. Mazza's supervisory role and the assignment of lower-level duties amounted to a *de facto* demotion.

**157.** Since her protected activity, the City has offered Ms. Mazza no path to promotion.

**158.** Ms. Mazza's health has worsened as these conditions have continued.

**159.** These conditions are continuing.

**F. Ms. Mazza's Damages**

**i. Economic losses.**

**160.** Ms. Mazza's position, Business Services Supervisor, is classified at pay grade EX-10, with an annual base salary of $72,492.36.

**161.** When Ms. Mazza applied, the City posted the Fire Administration and Financial Business Manager position at a salary of $66,293.38, the minimum of a pay range that ran to $99,440.08.

**162.** On information and belief, that range was the City's FY2025–2026 range for pay grade EX-12, two pay grades above Ms. Mazza's position.

**163.** Under the City's pay practices, promotion to that position would have raised Ms. Mazza's pay 10% above her then-current salary.

**164.** When Ms. Mazza applied for the positions at issue, the maximum salary for her EX-10 grade was $88,501.31, compared with a maximum of $99,440.08 for the Fire Administration and Financial Business Manager position.

**165.** Under the City's FY2026–2027 Exempt Pay Plan, the maximum salary for Ms. Mazza's EX-10 grade is $89,828.83, compared with $100,931.68 for EX-12.

**166.** The City's FY2026–2027 Exempt Pay Plan lists "Manager, Fire Administration & Financial Business" at pay grade EX-12, with a range of $67,287.78 to $100,931.68.

**167.** The Senior Recovery Business Manager position was posted at a salary of $66,293.38 to $69,608.05. On information and belief, it is classified at pay grade EX-12, whose FY2026–2027 range is $67,287.78 to $100,931.68, two pay grades above Ms. Mazza's position. When Ms. Mazza applied for the

position on May 19, 2025, her annual base salary was approximately $65,578.50, below the posted minimum.

**168.** Had the City selected Ms. Mazza for the Senior Recovery Business Manager position, she would have begun in that position on or about August 4, 2025.

**169.** Because the City denied her each position, Ms. Mazza has lost the difference between her pay and the pay of the position she was denied, from the date she would have started in it.

**170.** Ms. Mazza has also lost the employer-paid benefits tied to the higher salary, including retirement contributions and retirement credit under the North Carolina Local Governmental Employees' Retirement System.

**171.** Ms. Mazza will continue to lose that difference in pay and benefits until she is placed in a comparable position.

**ii. Emotional and physical harm.**

**172.** Before the events described in this Complaint, Ms. Mazza had never been diagnosed with anxiety or depression and had never been prescribed anti-anxiety medication.

**173.** Ms. Mazza has since been diagnosed with generalized anxiety disorder and depression.

**174.** Ms. Mazza has been prescribed anti-anxiety medication, which she now takes.

**175.** After the City denied her the Senior Recovery Business Manager position, Ms. Mazza suffered seizures that increased from one or two a week to three to five a week.

**176.** The stress of being denied promotion and treated unfairly exacerbated Ms. Mazza's seizures.

**177.** Ms. Mazza's primary care physician and neurologist have documented the effect of work stress on her health. A physician placed Ms. Mazza out of work for one week because of work stress.

**178.** Ms. Mazza has suffered physical injury, emotional pain, mental anguish, humiliation, inconvenience, loss of enjoyment of life, and damage to her professional reputation.

**First Cause of Action**
**Race Discrimination – Failure to Promote,**
**Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-2(m)**
**(Against the City)**

**179.** Plaintiff incorporates the preceding paragraphs.

**180.** Ms. Mazza is Black and a member of a protected class.

**181.** Ms. Mazza applied for, and was qualified for, the Fire Administration and Financial Business Manager position (¶¶ 47–50, 56–57).

**182.** The City rejected Ms. Mazza and selected a white candidate (¶¶ 60–62).

**183.** On information and belief, the selected candidate was less qualified than Ms. Mazza (¶¶ 63–66).

**184.** The City's stated reasons for its decision are inconsistent with the posting and are a pretext for race discrimination (¶¶ 42–48, 70–72).

**185.** Race was a motivating factor in, and a but-for cause of, the City's decision.

**186.** The City's handling of the Senior Recovery Business Manager position (¶¶ 73–92) is further evidence of its discriminatory intent.

**187.** As a direct and proximate result, Ms. Mazza has suffered the damages described in ¶¶ 165–183.

WHEREFORE, on her First Cause of Action, Plaintiff asks the Court to enter judgment against the City and to award:

(a) back pay equal to the difference between the pay and benefits of the Fire Administration and Financial Business Manager position and Ms. Mazza's actual pay and benefits, from October 10, 2025, through judgment, under 42 U.S.C. § 2000e-5(g)(1), in an amount to be determined at trial;

(b) prejudgment interest on back pay, in an amount to be determined at trial;

(c) instatement to the Fire Administration and Financial Business Manager position or a comparable position, or front pay in lieu of instatement, in an amount to be determined at trial;

(d) lost retirement contributions and credit, in an amount to be determined at trial;

(e) compensatory damages for future pecuniary losses, physical injury, including the exacerbation of her seizures, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

(f) declaratory and injunctive relief under 42 U.S.C. § 2000e-5(g), prohibiting further discrimination in promotion;

(g) reasonable attorneys' fees, expert fees, and costs, in amounts to be determined under Fed. R. Civ. P. 54(d), under 42 U.S.C. § 2000e-5(k); and

(h) post-judgment interest and such other relief as the Court deems just.

**Second Cause of Action**
**Retaliation, Title VII, 42 U.S.C. § 2000e-3(a)**
**(Against the City)**

**188.** Plaintiff incorporates the preceding paragraphs.

**189.** Ms. Mazza engaged in protected opposition and participation activity (¶¶ 127–133).

**190.** The City knew of that activity (¶¶ 134–137).

**191.** The City denied Ms. Mazza the Fire Administration and Financial Business Manager position (¶ 60).

**192.** The City has continued to exclude Ms. Mazza from upper-level exempt positions (¶ 142).

**193.** After Ms. Mazza filed her charge, the City eliminated the position she supervised and assigned its duties to her without additional pay (¶¶ 143–153).

**194.** Removing Ms. Mazza's supervisory role and adding uncompensated lower-level duties left her worse off in the terms and conditions of her employment, hindered her advancement, and would dissuade a reasonable worker from making or supporting a charge of discrimination.

**195.** The City has demoted Ms. Mazza, assigned her higher-graded duties without pay, and ignored her complaints, and these conditions are continuing (¶¶ 154–164).

**196.** On information and belief, the City has deliberately worsened Ms. Mazza's working conditions to pressure her to leave its employment.

**197.** Retaliation was a but-for cause of those actions.

**198.** The City's conduct would dissuade a reasonable worker from making or supporting a charge of discrimination.

**199.** As a direct and proximate result, Ms. Mazza has suffered the damages described in ¶¶ 165–183.

WHEREFORE, on her Second Cause of Action, Plaintiff asks the Court to enter judgment against the City and to award:

(a) back pay equal to the difference between the pay and benefits of the Fire Administration and Financial Business Manager position and Ms. Mazza's actual pay and benefits, from October 10, 2025, through judgment, under 42 U.S.C. § 2000e-5(g)(1), in an amount to be determined at trial;

(b) prejudgment interest on back pay, in an amount to be determined at trial;

(c) instatement to the position she would have held absent retaliation, or front pay in lieu of instatement, in an amount to be determined at trial;

(d) lost retirement contributions and credit, in an amount to be determined at trial;

(e) compensatory damages for future pecuniary losses, physical injury, including the exacerbation of her seizures, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, in the aggregate with any compensatory damages awarded under 42 U.S.C. § 1981a on the First Cause of Action;

(f) declaratory and injunctive relief under 42 U.S.C. § 2000e-5(g), prohibiting further retaliation;

(g) reasonable attorneys' fees, expert fees, and costs, in amounts to be determined under Fed. R. Civ. P. 54(d), under 42 U.S.C. § 2000e-5(k); and

(h) post-judgment interest and such other relief as the Court deems just.

**Third Cause of Action**
**Race Discrimination, 42 U.S.C. § 1981, Enforced Through 42 U.S.C. § 1983**
**(Against Budzinski, Individually)**

**200.** Plaintiff incorporates the preceding paragraphs.

**201.** Section 1981 guarantees all persons the same right to make and enforce contracts, including the benefits, privileges, terms, and conditions of employment, regardless of race. Against state actors, that right is enforced through § 1983.

**202.** At all relevant times, Budzinski acted under color of state law (¶ 10).

**203.** Budzinski controlled the selection for the Fire Administration and Financial Business Manager position (¶¶ 51–54, 60).

**204.** Budzinski selected a white candidate who, on information and belief, was less qualified than Ms. Mazza (¶¶ 62–66).

**205.** Budzinski relied on a communications criterion that the posting did not list as a minimum qualification (¶¶ 46–48, 70).

**206.** That reason was a pretext for race discrimination.

**207.** Budzinski intentionally discriminated against Ms. Mazza because of her race. But for her race, she would have received the position.

**208.** The right to be free from intentional race discrimination in promotion by a public employer was clearly established long before October 2025.

**209.** Budzinski acted with malice or reckless indifference to Ms. Mazza's federally protected rights.

**210.** As a direct and proximate result, Ms. Mazza has suffered the damages described in ¶¶ 165–183, and she is entitled to punitive damages against Budzinski.

WHEREFORE, on her Third Cause of Action, Plaintiff asks the Court to enter judgment against Budzinski and to award:

(a) lost wages and benefits equal to the difference between the pay and benefits of the Fire Administration and Financial Business Manager position (posted salary $66,293.38, pay range to $99,440.08) and Ms. Mazza's actual pay and benefits, from October 10, 2025, through judgment, in an amount to be determined at trial;

(b) prejudgment interest on those lost wages, in an amount to be determined at trial;

(c) future lost earnings caused by the denial of the Fire Administration and Financial Business Manager position, in an amount to be determined at trial;

(d) lost retirement contributions and credit, in an amount to be determined at trial;

(e) compensatory damages for physical injury, including the exacerbation of her seizures, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, and damage to reputation,

(f) punitive damages against Budzinski;

(g) reasonable attorneys' fees, expert fees, and costs, in amounts to be determined under Fed. R. Civ. P. 54(d), under 42 U.S.C. § 1988(b) and (c); and

(h) prejudgment and post-judgment interest and such other relief as the Court deems just.

**Fourth Cause of Action**
**Race Discrimination, 42 U.S.C. § 1981, Enforced Through 42 U.S.C. § 1983**
**(Against Ogles, Individually)**

**211.** Plaintiff incorporates the preceding paragraphs.

**212.** At all relevant times, Ogles acted under color of state law (¶ 13).

**213.** Ogles passed over Ms. Mazza in favor of a white candidate (¶ 83).

**214.** Ogles rejected Ms. Mazza based on a "construction experience" criterion that was not a posted qualification or part of the interview questions (¶¶ 84–85).

**215.** On information and belief, Ogles participated in the decision to repost the position under a new requisition rather than reopen it, and to require Ms. Mazza to apply again (¶¶ 87–89).

**216.** Ogles's reliance on an undisclosed criterion and the departure from City policy were pretexts for race discrimination.

**217.** Ms. Mazza's economic losses on this claim run from the date she would have started in the Senior Recovery Business Manager position (¶¶ 172–173), and they are distinct from her losses on the Third Cause of Action for every period before October 10, 2025. For later periods, Plaintiff pleads them in the alternative to avoid double recovery.

**218.** But for Ms. Mazza's race, she would have received the position.

**219.** The right Ogles violated was clearly established.

**220.** Ogles acted with malice or reckless indifference to Ms. Mazza's federally protected rights.

**221.** As a direct and proximate result, Ms. Mazza has suffered the damages described in ¶¶ 165–183, and she is entitled to punitive damages against Ogles.

WHEREFORE, on her Fourth Cause of Action, Plaintiff asks the Court to enter judgment against Ogles and to award:

(a) lost wages and benefits equal to the difference between the pay and benefits Ms. Mazza would have received in the Senior Recovery Business Manager position (pay grade EX-12), including the promotional increase and salary-range progression of that grade, and her actual pay and benefits, from August 4, 2025, through judgment, in an amount to be determined at trial;

(b) prejudgment interest on those lost wages, in an amount to be determined at trial;

(c) future lost earnings caused by the denial of the Senior Recovery Business Manager position, in an amount to be determined at trial;

(d) lost retirement contributions and credit, in an amount to be determined at trial;

(e) compensatory damages for physical injury, including the exacerbation of her seizures, emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life, humiliation, and damage to reputation;

(f) punitive damages against Ogles;

(g) reasonable attorneys' fees, expert fees, and costs, in amounts to be determined under Fed. R. Civ. P. 54(d), under 42 U.S.C. § 1988(b) and (c); and

(h) prejudgment and post-judgment interest and such other relief as the Court deems just.

**Fifth Cause of Action**
**Municipal Liability, 42 U.S.C. § 1981, Enforced Through 42 U.S.C. § 1983**
**(Against the City)**

**222.** Plaintiff incorporates the preceding paragraphs.

**223.** A municipality is liable under § 1983 when a deprivation of federal rights results from its official policy, from a custom so persistent and widespread as to carry the force of law, or from the deliberate indifference of its final policymakers to a known pattern of violations.

**224.** The City maintains a custom of subjective, department-controlled hiring and promotion (¶¶ 108–116).

**225.** That custom has excluded Black women from upper-level management (¶¶ 120–123).

**226.** The City's final policymakers had actual notice of that custom and its effect on Black women (¶¶ 93–116, 136–137).

**227.** The City's policymakers allowed the custom to continue, including in the October 2025 Fire Department selection (¶¶ 52–54, 117–119, 126).

**228.** That inaction was deliberate indifference.

**229.** The custom was the moving force behind the denial of promotion to Ms. Mazza (¶¶ 70–71, 84–89).

**230.** As a direct and proximate result, Ms. Mazza has suffered the damages described in ¶¶ 165–183.

WHEREFORE, on her Fifth Cause of Action, Plaintiff asks the Court to enter judgment against the City and to award:

(a) back pay for the denial of the Fire Administration and Financial Business Manager position, from October 10, 2025, through judgment, in an amount to be determined at trial;

(b) back pay for the denial of the Senior Recovery Business Manager position, from August 4, 2025, through judgment, in an amount to be determined at trial, awarded only for periods not covered by item (a);

(c) prejudgment interest on back pay, in an amount to be determined at trial;

(d) instatement to the position she would have held absent discrimination, or front pay in lieu of instatement, in an amount to be determined at trial;

(e) lost retirement contributions and credit, in an amount to be determined at trial;

(f) compensatory damages for physical injury, including the exacerbation of her seizures, emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life, humiliation, and damage to reputation, in an amount to be determined at trial;

(g) declaratory relief and an injunction requiring the City to adopt and follow written, job-related, and consistently applied promotion procedures;

(h) reasonable attorneys' fees, expert fees, and costs, in amounts to be determined under Fed. R. Civ. P. 54(d), under 42 U.S.C. § 1988(b) and (c); and

(i) post-judgment interest and such other relief as the Court deems just.

**Prayer for Relief**

WHEREFORE, Plaintiff Alisha D. Mazza respectfully asks the Court to:

1. Declare that Defendants' acts and practices violate Title VII and 42 U.S.C. § 1981;
2. Permanently enjoin the City from the discriminatory and retaliatory practices alleged, and order it to adopt and follow written, job-related, and consistently applied promotion procedures;
3. Order the City to promote Ms. Mazza to the position she would have held but for the discrimination and retaliation, or award front pay in the alternative;
4. Award back pay, lost benefits, and all other lost compensation;
5. Award compensatory damages, including for emotional distress, humiliation, and harm to reputation;
6. Award punitive damages against Defendants Budzinski and Ogles;

7. Award reasonable attorneys' fees and costs under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988;
8. Award pre- and post-judgment interest; and
9. Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

This the 28th day of October, 2026.

Respectfully submitted,

**LITTLEJOHN LAW, PLLC**

*/s/ Micheal L. Littlejohn, Jr.*
Micheal L. Littlejohn, Jr.
N.C. State Bar No. 49353
227 W. 4th Street, Suite 302
Charlotte, NC 28202
Mailing Address: P.O. Box 16661
Charlotte, NC 28297
Telephone: (704) 322-4581
Facsimile: (704) 625-9396
Email: mll@littlejohn-law.com
*Attorney for Plaintiff Alisha D. Mazza*